TEMPLE, ADMINISTRATOR *v.* SMITH, *et al.*

5-237                                    262 S. W. 2d 898

Opinion delivered December 21, 1953.

*Bridges & Young,* for appellant.

*B. Ball* and *Carroll C. Hollensworth,* for appellee.

WARD, J.  This appeal calls on us to decide whether the finding of the chancellor is supported by the weight of the testimony.

Ed McClain, a negro farmer, was found dead in a well on his place on February 26, 1952.  On March 17, 1952, a deed was filed for record, shown to have been executed on February 7, 1952, purporting to be signed by the deceased, and conveying his farm to appellee,

J. D. Smith. The deed provided that the deceased could live on the farm as long as he desired.

On July 15, 1952, suit was filed by the administrator of deceased's estate to cancel the said deed on the ground of forgery. The chancellor found that the testimony did not support the allegation of forgery and the administrator has appealed. The testimony for and against forgery is so evenly divided that it presents a close question as to which side preponderates, but, in accordance with the well recognized fact that the trial judge had an opportunity which we do not have to observe the witnesses and evaluate their credibility, we have chosen to affirm his decision.

The testimony was substantially as hereafter set out.

## FOR APPELLEE

Appellee, Smith, stated in substance: I knew Ed McClain during his lifetime and bought some land from him about the 7th of February 1952 and received a deed which was acknowledged by W. E. Pope; McClain signed the deed with the understanding of what he was doing, and the certified copy of the recorded deed which is shown to me appears to be a true copy of the deed which I received but I have lost the original deed. On cross examination: I gave McClain $1,200 in cash which I had on my person; I have been trading since 1935 and can get $1,200 any time I get ready for it; I have been trading in land and timber and had some cash all along; I mortgaged the land for $800 because I wanted some more money; the deed has a 55 cent revenue stamp on it but I don't know exactly what the correct amount should have been and wasn't trying to beat the government out of $1.10; Sometimes I don't put any stamps on deeds when the consideration is not more than $10; The consideration shown in the deed is $10; I never told Mr. Vickers that I was in serious trouble, I don't say that he lied but I do say that he is old and may have forgotten. Mr. Linder the prosecuting attorney was asking me about who got McClain's money and asked me to give him

the original deed, I told him I didn't have it and he told me to meet him at 1 o'clock; I didn't give him the deed because it was at Vick and I didn't have time to go get it, he was trying to find out who killed McClain and threw him in the well but he didn't exactly leave the impression that I was under suspicion; I told him that I would go get the deed and bring it to him but I didn't because I went to Vick and got it and left it at Bill Pope's and then went down and estimated some timber on the old Harding place, I told my brother I had the deed and he and I went to Bill's house and got it and I called the prosecuting attorney and told him I would bring it over the next morning; He said to wait and that he would come and get it and I said all right; I put it in my pocket and the next morning I went down and estimated 210 acres for Hubert Savage and the prosecuting attorney was to meet me, and I went back to the hotel and had lunch and when I went to bring the deed over I felt in my pocket and it was gone; I just can't remember exactly the date on which the deed was made or the day it was recorded; At the time I mortgaged the property I had a few little hot checks out—I remember one that was presented to me. Redirect examination: I have been engaged in buying and cruising timber for many years; There is a psychological effect in offering cash and sometimes I can drive a better bargain that way—some people don't like checks. Re-cross examination: I have bought several tracts of timber and paid as high as $2,500 cash.

W. E. Pope, in substance, stated: I live at Warren and know John D. Smith and knew the deceased during his lifetime; I am a notary public for Bradley County; On or about February 7, 1952, I took an acknowledgment on a deed from Ed McClain to J. D. Smith covering the land in question at the front gate of McClain's house; I wrote the deed and I saw Ed McClain sign it and I saw the money pass between Smith and McClain; (examining the copy of the deed) The description is right but the clause giving McClain the right to live on the place at the bottom of the description doesn't seem right;

I state positively that Ed McClain did sign this deed in my presence and I so acknowledged it. Cross examination: I believe the deed was dated February 5th and it was signed between 8 and 9 o'clock in the morning in front of Ed McClain's house; Since the deed shows February 7th I imagine that is right; If a witness testified that he was with McClain all day February 7th and that McClain did not sign the deed they just don't know what they were talking about; I don't know how much money was passed it was in currency rolled up; I usually charge $5 for taking an acknowledgment but the best I remember Smith started to pay me and I asked him if he would go look at a tract of land as I was busy building my house and I didn't charge him; He did go look at the land; My wife teaches school and sometimes I take her in the morning about 7:30—I don't know that I took her on the morning of the 7th but I could drive from there to McClain's house in 30 or 40 minutes; I drove down to Preston Phillips' house and left the car there and then walked on to McClain's about a quarter mile.

G. B. Colvin, Sr. testified: I am the circuit clerk and recorder and have held such office for 10 years; Sometimes people hold their deeds for several days or weeks before they bring them in to be recorded—the time varies; I have certified to the copy of the deed presented in evidence.

## FOR APPELLANT

Testimony introduced by appellant to show that the deed in question was a forgery is in substance as follows: Several witnesses who live at Johnsville and who were well acquainted with the deceased testified that the deceased stated to them subsequent to February 7th that he had not sold his land or that he was not going to sell his land and gave as his reason that he would have no place to go. Some testified that deceased told them he was going to fix up the fences on the place and plant a crop. Two witnesses testified that they went fox hunting with the deceased on the night of

February 6th; that they returned about 2 o'clock in the morning and that deceased stayed all night with one of them; and that the deceased did not return to his home until late in the afternoon of the 7th. One witness testified that he went to the deceased's home on the morning before his body was found in the well that night and that the mattress and part of the house was on fire. J. E. Vickers stated that appellee Smith told him soon after the deceased's body was found that some one had gotten him in serious trouble. The prosecuting attorney testified that while making an investigation of the deceased's death he asked appellee Smith to give him the original deed but that Smith failed or refused to do so, stating on one occasion that he would stand on his constitutional rights. No money was found on the deceased or at his home and the bank record showed that he had approximately $50 to his account.

Preparatory to rendering the decree the chancellor made a detailed statement of the facts and the law pertaining to this case, and after carefully reviewing several authorities he came to the conclusion that the testimony given by numerous witnesses to the effect that the deceased had said he had not and would not sell his property was not competent because it was not based on any positive proof of a forgery. We think it is unnecessary for us to consider this legal question. The chancellor also said, and we agree, that considering "the self-serving testimony objected to and the presumption by reason of failure to produce the deed and the failure to explain where defendant got the money he said he paid for the land, together with other evidence as to the activities of Ed McClain and the evidence of plaintiff's witnesses concerning places they had seen defendant Smith and W. E. Pope and statements they said defendant Smith and Pope made, this case on the part of plaintiff depends wholly upon circumstantial evidence and inconclusive presumptions or inferences. The burden is upon plaintiff in this case to prove the falsity of the execution and acknowledgment of the deed in question by a preponderance of the evidence.''

From our view of the evidence in this case some of the appellant's testimony is not necessarily damaging to appellee's claim. For example: There is much testimony that the deceased said he was going to continue to farm his land and that if he sold he would have no place to go, but the deed itself provided that the deceased should live on the land as long as he desired. Again it is reasonable to assume that some of appellant's witnesses might have been mistaken on very material points. For example: The witnesses who said they went hunting with the deceased and that the deceased was not at home at the time the deed was supposed to have been executed on February 7. It must be remembered that it was only after the deed was recorded on the 17th of the following month that any suspicion could have arisen which made the date of February 7 important, and it is possible that these witnesses could have been mistaken as to the date. It is true that Smith's failure to produce the original deed when called for and his explanation of how he lost the deed raised suspicions against his contention but, at most, they are only suspicions. On the other hand the testimony of Smith and Pope can not be attacked on the ground of mistake. In order to reverse this case it would have to be on the ground that both of these witnesses deliberately falsified their testimony. While of course this view is entirely possible yet it is significant that the character of neither of them has been impeached.

As heretofore stated we are unable to say that the chancellor's finding in favor of appellees on the close question of fact herein presented, particularly because of his better opportunity to observe the witnesses and appraise their veracity, is against the weight of the evidence.